IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IMG WORLDWIDE, INC. | ) | CASE NO. 1:10-cv-794 |
| | ) | |
| Plaintiff, | ) | JUDGE KATHLEEN M. O'MALLEY |
| | ) | |
| vs. | ) | **DECLARATION OF** |
| | ) | **MATTHEW BALDWIN** |
| MATTHEW BALDWIN | ) | |
| | ) | |
| Defendant. | ) | |

I, Matthew Baldwin, declare as follows:

1. I make this declaration of my own personal knowledge.

2. I am a citizen of California and reside in Los Angeles. My address is 1715 Camden Avenue, Apt. 107, Los Angeles, California 90025. I signed a lease for my current apartment in March 2010.

3. On April 2, 2010, I resigned from IMG Worldwide, Inc. ("IMG"), where I worked for nearly six years as an agent representing professional and collegiate sports coaches. I worked in IMG's Minnesota office. I never worked for IMG in Ohio. I did not resign from IMG for any improper purpose, but only to seek new and better opportunities for my growing family and me.

4. Prior to IMG's commencement of this action, I commenced an action in the United States District Court of the Central District of California, where I now reside and where my new employer, Creative Artists Agency ("CAA") is headquartered, seeking a declaration that the non-solicitation covenant in my contract with IMG is void and unenforceable. A copy of the complaint in that action is attached hereto as Exhibit A. I

1

commenced that action precisely because I want to ensure that I may lawfully represent certain coaches that I represented while I was employed by IMG. Since leaving IMG, I have not solicited any of my former clients. I will solicit my former clients only if the federal court in California rules in my favor.

5. In support of its motion for a TRO, IMG has made a number of accusations which are untrue and which I will address herein.

## BACKGROUND

### Career at IMG

6. I began my career in the Coaches Division of IMG after my second year of law school as a summer intern in 2003. Upon my graduation from law school, Gary O'Hagan (who is also a lawyer) offered me a full-time position as an agent conditioned on my passing the bar exam. I passed the bar and started with IMG in August 2004. I am an active member of the Ohio bar.

7. In order to obtain the job with IMG, I was required to sign an employment agreement, the terms of which were not negotiable. I was not given a contract for a term of years; IMG could fire me at any time; I would have to agree to a non-compete provision; and I would not be paid much. Since my experience as an agent was limited to my internship, this was virtually the only employment opportunity for me to start a career as an agent in the sports business. I have always worked for IMG in Minnesota. I have never worked out of IMG's Cleveland offices and have only been there twice -- both times in 2008.

8. IMG was and still is the dominant sports agency in the world, with huge market power, and its Coaches Division represents several marquee professional and collegiate sports coaches, such as John Wooden, Tom Coughlin, Wade Phillips, Troy Calhoun, Mike

Montgomery and Jay Wright. IMG has several divisions, including IMG Sports and Entertainment, IMG College, IMG Media and IMG Fashion. IMG Coaches is a sub-division of IMG Sports and Entertainment.

9. In general, as an agent, my responsibilities are to procure and negotiate employment contracts for professional and collegiate sports coaches and to recruit and solicit coaches to enter into endorsement, speaking, literary, broadcasting and agent contracts. As an agent, I develop close relationships with my clients and a very important part of my job is to foster those relationships before, during and after contract negotiations.

**Departure from IMG**

10. Although IMG represents some of the most recognizable and best compensated professional and collegiate sports coaches, I did not see a defined career path for me at IMG or significant opportunities for future growth. I also felt that I was doing the lion's share of the work for the Coaches Division but was not receiving adequate support or compensation commensurate with the revenue I was generating for IMG. My salary was increasing in small increments; my starting salary in 2004 was $45,000; in 2010, it was $90,000. I was underpaid.

11. On several occasions, I discussed my concerns with my supervisor, Gary O'Hagan, as well as with Sandy Montag, the Senior Vice President of IMG Sports and Entertainment, but despite assurances that such concerns would be addressed, they never were. My raise and bonus in 2008 and 2009 were disappointing. O'Hagan was aware that I was dissatisfied with my compensation and, on certain occasions, promised me a percentage of the net revenue I generated or certain "stock options" in a company called Bite Tech, but none of O'Hagan's promises ever materialized.

3

12.     My working environment at IMG was also problematic. While IMG's headquarters are in Cleveland, I worked exclusively in IMG's Minnesota office with O'Hagan. I found O'Hagan to be volatile and difficult to work with and there were no other agents in the Minnesota office.

13.     To the best of my knowledge, I generated more revenue for IMG in 2009 than I had in any year in the past. At IMG Sports and Entertainment's annual meeting in December of 2009, Montag and O'Hagan told me that they were very pleased by my performance and were looking forward to my continued success. And I had continued success. For instance, shortly after that meeting, I negotiated a fully guaranteed, four-year, multi-million dollar contract with the Seattle Seahawks on behalf of offensive coordinator Jeremy Bates. Bates' contract will generate fees for IMG for years to come. In paragraph 39, *infra*, I list over 20 contracts that I negotiated in the first quarter of 2010 alone.

14.     In the beginning of 2010, I learned that my wife was pregnant and, as such, my concerns about my career development and compensation became even more pressing.

15.     In January and February of 2010, I also began to explore opportunities to develop my career as an agent outside of IMG. In February and March of 2010, I engaged in serious discussions with CAA, which is headquartered in Los Angeles, about the possibility of accepting a position with CAA's Coaches Division. The opportunity with CAA was very attractive for several reasons: (a) CAA's Coaches Division is relatively young and appeared to offer better opportunities for professional growth; (b) CAA was willing to offer better compensation than I would receive at IMG; (c) my wife and I were very interested in relocating to California where we have many friends and the weather is better than it is in Minnesota; (d) I would have the opportunity to work at CAA's Los Angeles headquarters which is a more robust,

dynamic environment than IMG's two-agent office in Minneapolis; and (e) CAA does not have a college division, like IMG College, which was an obstacle for IMG Coaches, because, among other things, coaches who worked at schools IMG College represented felt that we could not adequately represent them, as it is awkward to sit across from a college you represent to negotiate hard for a coaching client.

16. I often obtained comparative salary information by making FOIA requests from public universities. Montag, who runs IMG Sports and Entertainment, ordered me to stop requesting contracts from our clients' peers at state universities through FOIA requests because, apparently, IMG College was receiving complaints from its university clients. Montag told me that IMG College was much more profitable (and powerful) than IMG Coaches and threatened that IMG would cut the Coaches Division if IMG College continued to receive complaints concerning my FOIA requests. This was only one of several times that Montag threatened to cut IMG Coaches if it interfered with IMG College. And since many of my clients are collegiate sports coaches, this gave me good cause for concern.

17. In March of 2010, CAA offered me a position as an agent in their Coaches Division. CAA's offer included a 50% increase over IMG's base salary, a signing bonus and a performance-based bonus.

18. This represented an opportunity to work for a more robust company in a better working and living environment, at substantially higher pay.

19. On March 31, 2010, I spoke with Montag about compensation. Montag said that he was "bullish" about a salary increase and even discussed obtaining additional compensation for me via a percentage of net revenue, but when I asked for specifics about the increase or the percentage, he dodged the question. As it turned out, the bonus I received on

March 31, 2010 was *half* of the bonus that I received in 2008 or 2009 ($10,000 in 2010 versus $20,000 in 2008 and 2009). It was clear to me IMG was going to continue to underpay me, and I was glad that I had the opportunity to leave.

20. On April 2, 2010, I informed O'Hagan that I was resigning effective immediately. I called O'Hagan in the morning and left him a voicemail message and followed up with an email. I did not inform any client, including one of my closet friends, Jeremy Bates, that I was leaving before I communicated with O'Hagan, and IMG's allegation that I did so is unsupported and completely untrue.

21. After I contacted O'Hagan, I called a number of the coaches I had worked with while at IMG to tell them I had resigned. I wanted the coaches to hear the news from me, not IMG. O'Hagan has a volatile personality and there is bad blood between IMG and CAA. Over the last five years, IMG's Team Sports Division (Baseball, Football, Hockey) defected to CAA. IMG was once the worldwide leader in representing athletes in team sports; now IMG's Team Sports business is largely at CAA. I did not want my name smeared by O'Hagan or IMG. In addition, many of the coaches I've represented are close personal friends of mine. I have been invited to be in one of their wedding parties later this year. So I called many of them to tell them the news. Nothing in my IMG employment agreement precluded me from doing so.

### My Relocation to California

22. Since April 2, 2010, I have been employed by CAA at its headquarters in Los Angeles, California. In connection with my new employment, I have permanently relocated to Los Angeles.

23. On or around March 29, 2010, I signed a one-year lease for an apartment in Los Angeles, which is where I live now. Attached as Exhibit B is a copy of my lease.

24. I have registered to vote in California.

25. I have informed my bank about my relocation to California and new address. They have changed their records to reflect this.

26. I have informed my credit card companies about my relocation and new address. They have changed their records to reflect this.

27. I have informed the financial institutions that service my student loans about my relocation and new address. They have changed their records to reflect this.

28. My car is insured in the state of California.

29. I pay California state income taxes.

30. My wife has informed her employer in Minnesota, a law firm, that she will be resigning so she can join me in Los Angeles.[1]

31. On or around April 12, 2010, my wife and I hired a broker to sell our house in Minneapolis. We have already hired movers to move our belongings to California.

32. My wife and I plan to reside in California permanently, to establish our careers in California, and to raise our family in California.

33. Since joining CAA on April 2, I have been back to Minnesota once -- to accompany my wife to her doctor for an appointment and to take care of personal matters relating to my move to California.

---

[1] As I noted above, my wife is pregnant and is due in September. CAA has a 90-day waiting period, which will terminate in July 2010, before I can receive health insurance benefits. My wife is remaining in Minnesota where she has health insurance until June 2010. Wife will maintain her benefits through COBRA for a few weeks, and she will then be on my insurance when I am eligible to receive such benefits from CAA in July.

24. I have registered to vote in California.

25. I have informed my bank about my relocation to California and new address. They have changed their records to reflect this.

26. I have informed my credit card companies about my relocation and new address. They have changed their records to reflect this.

27. I have informed the financial institutions that service my student loans about my relocation and new address. They have changed their records to reflect this.

28. My car is insured in the state of California.

29. I pay California state income taxes.

30. My wife has informed her employer in Minnesota, a law firm, that she will be resigning so she can join me in Los Angeles.[1]

31. On or around April 12, 2010, my wife and I hired a broker to sell our house in Minneapolis. We have already hired movers to move our belongings to California.

32. My wife and I plan to reside in California permanently, to establish our careers in California, and to raise our family in California.

33. Since joining CAA on April 2, I have been back to Minnesota once -- to accompany my wife to her doctor for an appointment and to take care of personal matters relating to my move to California.

---

[1] As I noted above, my wife is pregnant and is due in September. CAA has a 90-day waiting period, which will terminate in July 2010, before I can receive health insurance benefits. My wife is remaining in Minnesota where she has health insurance until June 2010. Wife will maintain her benefits through COBRA for a few weeks, and she will then be on my insurance when I am eligible to receive such benefits from CAA in July.

### My Employment with CAA

34. Prior to joining CAA, I provided CAA with a copy of my employment agreement with IMG, which prohibits me from soliciting or representing any of my former clients at IMG for a period of two years. I agreed with CAA that I would not solicit any of my former clients unless and until a court ruled that I could.

35. On April 2, 2010, I commenced a declaratory judgment action in the Central District of California, where I now live and work, in order to obtain a declaration that I am able to lawfully solicit my clients under California law.

36. Although I do not believe that the non-compete in my employment agreement is enforceable, I have nonetheless refrained from soliciting my former clients pending a resolution of my lawsuit. As set forth above, I contacted many of my former clients and friends to tell them of my resignation and since then, my contact with my former clients at IMG has been minimal. Certain coaches have contacted me to see if I could represent them at CAA. In each case, I have told the coaches that I cannot represent them until my legal situation is resolved. Some of the coaches have told me that they are interested in having CAA represent them independent of me. CAA has a strong and growing Coaches Division, with a dynamic leader, Trace Armstrong (the former NFL player and NFL Players Association official), and many of the coaches simply do not like O'Hagan. Some of the coaches have contacted CAA and spoken with other CAA agents, notably Trace, about the possibility of CAA representing them. I have not been a party to those discussions.

### I Have Not Solicited My Former Clients

37. I have not reached out to any of IMG's clients to join CAA nor have I made plans to meet with any of IMG's clients. So far, my time has been consumed by meeting

new colleagues at CAA, familiarizing myself with CAA's personnel and computer systems, attending meetings and, in general, acclimating myself to the new position.

38. IMG's brief states that "IMG has uncovered evidence suggesting that both prior and subsequent to his resignation, Defendant actively solicited IMG Clients in order to induce those clients to leave IMG and transfer representation to his new employer." (IMG Brief, 6). But the only "evidence" which makes this "suggestion" is my attendance at a basketball game which, IMG asserts "upon information and belief," I attended to recruit Jay Wright. This is not "evidence." It is an accusation. And it is wrong. I informed Sandy Montag that I was attending the 2010 Big East Conference Tournament. Montag authorized the trip, and Montag approved my T&E expense report for it. Moreover, I didn't speak to Wright at that game. What's more, I attend basketball games and other sporting events all the time. It is part of my job. I am a sports agent. IMG has no evidence that I did anything wrong, because I haven't.

39. In the first quarter of 2010 I negotiated at least 20 contracts for IMG clients worth many millions of dollars -- contracts that will yield commissions for IMG for many years to come, and preclude me from earning commissions from these same clients. Below is a list of just some of the contracts that I negotiated in the first quarter of 2010 alone:

### Employment Contracts

#### NFL
- Darrell Bevell (Minnesota Vikings)
- Clarence Shelmon (San Diego Chargers)
- Jeremy Bates (Seattle Seahawks)
- Jedd Fisch (Seattle Seahawks)
- Pat McPherson (Seattle Seahawks)
- Art Valero (Seattle Seahawks)
- Jerry Gray (Seattle Seahawks)
- Chris Foerster (Washington Redskins)
- Tyke Tolbert (Carolina Panthers)
- Jim Bates (Tampa Bay Buccaneers), settlement
- Joe Baker (Tampa Bay Buccaneers), transition

9

**NCAA**
- Troy Calhoun, Head Coach (Air Force), contract extension
- Danny Hope, Head Coach (Purdue), contract extension
- Rex Walters, Head Coach (University of San Francisco)
- Brian Stewart (University of Houston)
- Clancy Pendergast (California)
- Neal Brown (Texas Tech)
- Manny Diaz (Mississippi State)

**UFL**
- Dennis Green, Head Coach (California Redwoods)
- Mike McDaniel (California Redwoods)
- Martin Bayless (California Redwoods)

**Media Contracts**

- Jay Wright, Head Coach (Villanova), Group Licensing Agreement, National Association of Basketball Coaches

Looking back, if I were really seeking to steer clients to CAA, what I could have done is drag out these negotiations and then try to get the coaches to join CAA, which would then enjoy the commissions. But I did not do that or even consider that, because I was at all times loyal to IMG. In fact, I negotiated numerous contracts for IMG's coaching clients in March of 2010, even as I was making plans to move to California and work for CAA. IMG has alleged no *facts*, and there are no *facts* in O'Hagan's declaration, suggesting, even remotely, that I was in any way disloyal to IMG while I was employed at IMG.

40. Since leaving IMG and joining CAA, I have not solicited any of my former clients. IMG has not put forward any facts that I have.

**O'Hagan's Declaration**

41. I have reviewed the Declaration of Gary O'Hagan. Certain allegations in O'Hagan's Declaration are erroneous. I will address each one in turn.

42.  *Jeremy Bates.* O'Hagan states that in "early 2010, Baldwin purposefully tried to exclude me from communications and negotiations for [Jeremy] Bates, who Baldwin has known since college. I was very surprised by Baldwin's actions in this regard." (O'Hagan Decl. ¶ 12.) This is not true.

43.  Bates told me that he wanted me, and only me, to handle his negotiations with any football team for the 2010 season because he did not think that O'Hagan understood his overall career plan and vision in the way that I did. I had previously negotiated Bates's contracts, and Bates is one of my best friends. I discussed Bates's request with O'Hagan and O'Hagan agreed to honor such request and exclude himself from the negotiations with any team.

44.  O'Hagan also conveniently ignores that, on behalf of IMG, I negotiated a huge contract with the Seattle Seahawks for Bates, a fully guaranteed, four-year deal worth millions of dollars. IMG has the standard 3% commission on that deal, meaning that IMG will over the next four years earn over $150,000 from the contract I negotiated. I could have sought to negotiate a one or two year deal for Bates, which would have allowed me to earn commissions in a year or two, when my covenant expires or is declared void. But I didn't. I negotiated the best deal I could for Bates and IMG -- a deal that will exclude me from earning commissions from his contracts for four years (two more than my restrictive covenant).

45.  *Randy Edsall.* O'Hagan implies (but does not swear, because he knows it's bunk) that I had something to do with Randy Edsall's departure from IMG in February 2010. (O'Hagan Decl. ¶ 13.) As O'Hagan knows, Edsall had been concerned -- for several years -- about a potential conflict of interest in connection with IMG's dual representation of him (as the head coach for University of Connecticut's football team) and his employer (the University of

Connecticut). Edsall expressed his dissatisfaction to O'Hagan on several occasions. At no point before or after my resignation did I solicit Edsall to leave IMG or to join CAA.

46. *Various Travel.* O'Hagan states that it was "highly unusual and suspicious" for me to attend the 2010 Big East Conference Tournament. (O'Hagan Decl. ¶ 14.) That is sheer nonsense. As an agent who represents professional and collegiate sports coaches, I routinely attend tournaments and games. There was nothing unusual about attending the Big East Conference Tournament this year as I attended the same event in 2008. O'Hagan mentions that Jay Wright also attended the event. I did not have any contact with Wright at the Tournament. And while O'Hagan states that I never "advised" him of my plan to attend the Tournament, I informed Montag that I was going to attend and Montag approved all expenses for my attendance. The few trips I took referenced in O'Hagan's declaration were normal fare for my job and all of them were approved by Montag.

47. *Paper Files.* O'Hagan further states: "Defendant took with him paper files containing confidential and proprietary information related to IMG's clients. Many of the manila folders later returned by Baldwin were empty." (O'Hagan Decl. ¶ 23.) That is false. I did not take a single paper file with me when I resigned from IMG and I do not have any IMG hard copy documents in my possession. I did, however, return to IMG several empty redwelds with IMG logos on them that I had in my possession. I could not have taken any documents from the redwelds before I returned them to IMG because no documents were in the redwelds in the first place.

48. *Unnamed Coaches.* O'Hagan also states: "At the Final Four, I learned that numerous coaches and IMG clients had been informed of Baldwin's departure even before I learned of his resignation." I do not know how such coaches could have been informed about

my departure before O'Hagan because the first person that I contacted was O'Hagan. Maybe he did not listen to the message I left for him, or read the email I sent him. O'Hagan does not mention who the coaches are so it is impossible for me to address this allegation any further.

49. ***April 1 Conversation.*** O'Hagan states that he spoke to me on April 1 and that I told him I was content at IMG and was not going to CAA. That is true. I did not know how to respond to his question. I had already accepted the offer from CAA; in fact, by then I had leased an apartment in California. I was headed to Florida with my wife on vacation (she was going on a cruise with some friends, and I was visiting some friends), and I did not want to get into an argument with O'Hagan. I was also furious about the 50% reduction in my bonus and simply could not wait to leave IMG. O'Hagan has a bad temper and I didn't want to start an argument, so I told O'Hagan that everything was fine, knowing that I would resign the next day. I then resigned the next day, my first official day at CAA.

### Transfer of Files to the USB Drive

50. I do not have a personal computer. I have always used my IMG laptop as my personal laptop. For that reason, I stored a lot of personal materials on my IMG laptop. Maybe I shouldn't have. But I did. The personal files I kept on the IMG laptop included, among other things, thousands of photos (including hundreds of photos from my wedding), law school documents, bar exam preparation materials, insurance forms, recipes, music files and some of my wife's personal documents.

51. My "backup system" was unsophisticated and consisted of a small USB drive. I am not technically savvy and, admittedly, I am a bit of a pack rat when it comes to personal files -- especially photos. While I should have backed up such files on a dedicated

back-up disk, I never did. I stored my electronic information on my IMG laptop and backed it up on a finger-sized USB drive.

52. After I accepted CAA's offer on April 1, 2010, I wanted to make sure that I did not lose my personal files. I copied the "My Documents" folder on my IMG laptop to the USB drive. I had done this before. It is how I "backed up" my computer. The "My Documents" folder contained a mix of personal files and IMG files.

53. In my mind, there is nothing at all confidential on the USB drive. The IMG materials that were in the "My Documents" folder were pretty innocuous and I do not believe that any of those materials are confidential trade secrets. I don't believe there are any trade secrets in this business. Clients are high-profile coaches in the media all of the time, and what coaches earn is publicly available in most cases. IMG's list of coaching clients is not a secret. At IMG, we would identify our current clients all the time, in any effort to get other coaches to sign with IMG.

54. After starting at CAA, I brought my USB drive to my office at CAA to transfer my electronic files to my CAA laptop to back them up. I have since been advised that this lawsuit was filed and that IMG contends that I misappropriated IMG's trade secrets and confidential information. I do not believe any materials I took are confidential at all, let alone trade secrets. Nonetheless, I have returned the USB drive to IMG, keeping no copy for myself. I have given my laptop to a computer expert hired by my attorneys, who will preserve it, and I will not have access to it until further notice. I have been given a new laptop. In addition, CAA has ensured that none of the files at issue have been backed up on any CAA server.

### IMG's Coaching Information Is Not Confidential

55. IMG makes it seem that it relies on confidential information in this business. It doesn't.

56. IMG Coaches shares its office space with ASA LLC which, I understand, is a financial services company unaffiliated with IMG with approximately 10 employees. All ASA employees had access to IMG Coaches' paper files. If IMG considered this information to be a trade secret, why would employees from another company have unrestricted access to it?

57. In any event, virtually none of the information at issue is confidential or secret. Information concerning coaches' salaries is public and, if it's not, otherwise easy to get. Most of the information that I compiled while at IMG is either public or readily available. If one types in a coach's name on Google with the word "salary" next to it, one is likely to quickly learn what that coach makes.

58. Anyone can access the database of salary information for NCAA coaches available on the USA Today website which also includes many of the actual contracts. *See* http://www.usatoday.com/sports/college/football/2009-coaches-contracts-database.htm. I have obtained contracts for most NCAA coaches at public universities through freedom of information act requests. Salary information for coaches at private colleges is often available through the college's 501(c)(3) tax filings. These are readily available for free at www.guidestar.com. I am also in regular contact with Larry Kennan of the NFL Coaches Association ("NFLCA"). The NFLCA maintains a comprehensive database of coaches' salaries. Teams, other coaches' agents and I routinely speak to Kennan to obtain this information. Michael Goldberg of the NBA Coaches Association ("NBCA") provides similar information with respect to the NBA coaches.

I can also ask any coach what he or she is making and the coach will usually answer my question.

59. Agents also talk among themselves, and often ask the coaches directly what they're earning. The information is widely available, and IMG's claim that it has some proprietary claim over what professional and collegiate coaches earn is not true.

60. IMG did not keep information about coaches' salaries in some sort of ultra-confidential "trade secret database." The "database" is an Excel spreadsheet that lists out the names of coaches, teams, salaries, and contract terms -- all of which are available on the Internet or through a phone call or by a FOIA request. And IMG shared this spreadsheet freely with both coaches and their employers. Every coach's agent has this information. There is nothing secret about it.

61. Biographical information concerning coaches is also widely available on the Internet. In addition, IMG's list of clients in the Coaches Division is hardly a secret. IMG states on its website that IMG's clients include John Wooden, Tom Coughlin, Wade Phillips, Mike Leach, Mike Montgomery, Jay Wright and others. Information concerning a certain coach's representation is often available on the Internet or can be obtained through a phone call or two to one's peers in the sports business. Indeed, the salaries of many of IMG's clients has been reported on ESPN and other news sources. O'Hagan and I would speak to the press all the time about various salary and contract negotiations.

62. IMG's representation contracts are sent to coaches all over the country. IMG routinely solicits coaches by sending them standard form IMG representation agreements. Sometimes coaches signed them and sent them back to IMG, sometimes they did not. IMG did

not mark these documents "Confidential" or place any confidentiality restrictions whatsoever on these contracts before they were sent out.

63. During my employment at IMG, I prepared recruiting presentations for potential clients. These documents were routinely distributed in advance of a meeting with a potential client to generate questions or comments. IMG never marked such documents "Confidential" nor did IMG ask any potential clients not to disclose these presentations.

64. I have personally spoken at various law schools, including Penn State and Baltimore, concerning the negotiation and terms of coaching contracts. I have heard others speak on this same issue. In April 2005, I made a presentation at the University of Toledo Sports Law Symposium about contract negotiations between coaches and teams. I asked O'Hagan (who is also a lawyer) whether I could show the participants a standard coach's contract and a redline markup to demonstrate how IMG negotiated the contract terms. O'Hagan said that I could, so I included these contract documents in my presentation. I do not see how IMG can now claim that their contracts are secret.

65. In addition, there's a standard 3% commission to agents in this business. IMG's commissions are no secret either.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: April 21, 2010

_____
Matthew Baldwin